UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 OCT -1  PM 3: 15

CLERK

BY_____
DEPUTY CLERK

| | |
|---|---|
| MARGARET HERREID, GUARDIAN OF TERESA M. HERREID, | ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 2:14-cv-255 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION
AND DENYING THE COMMISSIONER'S MOTION FOR ORDER
AFFIRMING THE COMMISSIONER'S DECISION AND REMANDING FOR
FURTHER PROCEEDINGS**
(Docs. 4 & 5)

Plaintiff Margaret Herreid, as guardian of Teresa M. Herreid ("Ms. Herreid"), is a claimant for Supplemental Social Security Income ("SSI") and disabled adult child's benefits. Pursuant to 42 U.S.C. § 405(g), she seeks a reversal and remand of a decision by Defendant Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration (the "Commissioner"), denying Ms. Herreid benefits.

Plaintiff contends that Administrative Law Judge ("ALJ") Thomas Merrill erred by: (1) finding that Ms. Herreid's depression was not a severe impairment; (2) concluding that Ms. Herreid's impairments did not meet the criteria under Listing 12.05C; (3) failing to consider whether Ms. Herreid's impairments met the criteria under Listing 12.05D; and (4) evaluating Ms. Herreid's residual functional capacity ("RFC") without sufficient consideration of the evidence. The Commissioner moves to affirm the decision.

Plaintiff is represented by James Torrisi, Esq. The Commissioner is represented by Special Assistant United States Attorney Monika K. Crawford. The court took this matter under advisement on June 10, 2015.

## I.    Factual and Procedural Background.

Ms. Herreid is a twenty-five year old woman who resides with her father, Robert Herreid, in Waterford, Vermont. Her mother died when she was eight years old. Plaintiff alleges that Ms. Herreid became disabled on September 15, 2011, as a result of cognitive impairments and an affective disorder. Ms. Herreid graduated from high school at age twenty and has worked for a few weeks in a butcher's shop, a gift shop, and a yarn shop. She has also volunteered in a nursing home and at a library. Most of these work settings involved her working with a relative, neighbor, or family friend.

### A.    Cognitive Impairments.

On October 7 & 9, 2009, Paul Donahue, Ph.D. conducted an educational assessment of Ms. Herreid. He administered a clinical interview, the Wechsler Individual Achievement Test ("WIAT-II"), and a parent interview. Dr. Donahue noted that Ms. Herreid enjoyed knitting, described herself as healthy, and "[s]he reported having adequate energy to get through the day." (AR 254.)

The WIAT-II measures several components of intelligence, including reading, mathematics, writing, and oral language abilities. The mean score on the test is 100, with a standard deviation of fifteen. Ms. Herreid's scores on the components of the WIAT-II ranged from eighty-two in spelling, which places her in the twelfth percentile, to sixty-six in listening comprehension, which places her in the first percentile. Her composite score was seventy-one, which places her in the third percentile.

Dr. Donahue concluded: "The Wechsler Individual Achievement Test (WIAT-II) yielded consistent results. All of the subscales were in single digits in terms of percentiles, with the exception of Spelling at 12%. This is a profile of a student with significant intellectual limitations, who requires significant modifications to be successful in school." (AR 255.)

2

From 2007 until 2010, Ms. Herreid participated in an Individualized Educational Program ("IEP") while attending the St. Johnsbury Academy. Eleanor Donovan, a special educator at the St. Johnsbury Academy, recorded that "[Ms. Herreid's] scores fell in the very low to low end of low average in all academic areas." (AR 234.) Ms. Herreid's teachers described her "as being very focused; independently completing tasks, sharing thoughts more in large groups; a hard worker; persistent; reflective; seeking adult assistance as needed; having more positive relationships with others; an eager learner; using supports about her emotions and doing better with talking about her frustrations." *Id.* Ms. Donovan described potential issues that Ms. Herreid would face in a work environment as: "the inability to initiate tasks in the workplace, lack of confidence in her abilities, very quiet, a little slow at tasks, sometimes makes random comments, and at times, daydreams." *Id.* She predicted that Ms. Herreid "will do well on a job site especially if some time is taken to show her how to do something. [Ms. Herreid] needs constant supervision and prompts until she learns a task. [Ms. Herreid] needs clear expectations and directions and then she will do well with just a few prompts." *Id.* The IEP predicted that "[u]pon completion of high school, [Ms. Herreid] will find employment in the geriatric services field" and "will complete any training requirements to become a geriatric aide." (AR 239.) The IEP further anticipated that Ms. Herreid would be able to live on her own.

From November 12, 2009 until December 18, 2009, Ms. Herreid received special education in a small group environment in developmental math, written language, reading, and language arts. From December 21, 2009 until June 4, 2010, she received special education in a small group environment, including direct instruction in life skills/transition skills and history. Ms. Herreid was "[i]nside [r]egular [c]lass 40-79%" of the time. (AR 244.) She was permitted additional time to complete tasks, tested in small group environments, and was allowed to use a calculator and a computer to assist her with calculations and written responses. The IEP described her mathematics abilities as "'substantially below proficient.'" (AR 248.) Overall, Ms. Herreid's "academic assessment indicates that she is performing below the 15th percentile rank in all areas and

3

will require specialized instruction that is not available in the general system of support."
(AR 250.)

## B.     Mental Health Impairments.

For over four years, Ms. Herreid participated in a one hour therapy session with
Katherine Cote, LICSW every two weeks.[1]  On September 12, 2011, Ms. Cote recorded
that Ms. Herreid "started therapy following a 9 month break.  She was seen from 2009-
2011 in high school for severe depression." (AR 405.)  She noted that in addition to
sleep disturbances, Ms. Herreid was experiencing "PTSD flashbacks" related to "past
sexual abuse." (AR 405.)  Ms. Cote observed that Ms. Herreid "appear[ed] very
depressed, no eye contact, flat affect, no interests" and that Ms. Herreid was "isolated at
school and [at] home" and needed to "[f]ocus on relationship skills." *Id.*  Ms. Cote saw
Ms. Herreid again on September[29, 2011.  During this session, Ms. Herreid "describ[ed]
the relationship in which she is being abused" and advised that she "does not want to end
[the] relationship but would like to have the ability to say no." *Id.*

In October of 2011, Ms. Cote noted that Ms. Herreid was taking a course with her
sister in childcare skills and felt "bad that [her] sister has to sit through 3 [hour] classes
with her." *Id.*  She further noted that Ms. Herreid "did not pass tests for LPN training for
nursing homes." *Id.*  Ms. Cote opined that Ms. Herreid's "depression exacerbated her
low mental functioning" and referred Ms. Herreid to her primary care physician, Sarah
Berrian, M.D., for the purpose of evaluating whether an antidepressant should be
prescribed. (AR 406.)  In doing so, she asked that Dr. Berrian see Ms. Herreid earlier
than the scheduled appointment because Ms. Herreid had been expressing suicidal
thoughts as a result of recent stressors.  On November 10, 2011, Ms. Cote observed that
Ms. Herreid "had a little more eye contact, but no change in affect." (AR 406.)  She
noted that Ms. Herreid "feels hopeless about jobs." *Id.*

On November 17, 2011, a nurse working with Dr. Berrian recorded that Ms.
Herreid "presents here with emotional distress.  Has an [appointment] to establish care at

---

[1] On February 15, 2013, Ms. Cote stated that she had treated Ms. Herreid for over five years.
Plaintiff submitted treatment records covering only two years.

a later date, but was put in for emotional distress per [Katherine] Cote. Patient reports trouble sleeping but would like to talk to Dr. Berrian about emotional distress." (AR 381.) Dr. Berrian then saw Ms. Herreid and screened her for a major depressive disorder and suicidality. She noted that she was doing so in response to Ms. Cote's report that Ms. Herreid "had voiced some suicidal thoughts[.]" (AR 383.) She further noted that she had talked to Ms. Cote prior to the visit and that, at that time, Ms. Cote had been seeing Ms. Herreid "for about 4 years." *Id.*

Dr. Berrian observed that Ms. Herreid was fully oriented and presented with a "normal mood and affect" and was "shy but once she was more comfortable with [Dr. Berrian] she had reasonable eye contact[.]" (AR 382.) Ms. Herreid reported no significant weight loss or gain or loss of appetite, no psychomotor agitation or retardation, and enjoyed "knitting and reading, crafts." (AR 381.) She, however, also reported that she had a depressed mood "some of the time[;]" "difficulty getting to sleep, then sleeps okay[;]" "mild fatigue" which "improves if she goes for a walk[;]" "sometimes" has "impaired concentration or indecisiveness[;]" was hopeless "some of the time[;]" and had recurrent thoughts of death or suicide "a little bit." (AR 381-82.)

Although Dr. Berrian recorded that Ms. Herreid reported "being sexually abused[,]" (AR 383), she described Ms. Herreid's "[g]rief reaction[,]" (AR 392), as the result of losing a relationship with one friend and the fear of losing another relationship but noted she had some friends to talk to and "is comfortable talking with [Katherine] Cote, her [counselor], and her grandmother[.]" (AR 382.) Dr. Berrian observed that Ms. Herreid "also has some intellectual limitations[,]" was currently volunteering twice a week where her sister works, and that the "difficulty finding work along with the recent problems with relationships have been causing situational stress[.]" (AR 383.) She noted that Ms. Herreid had "a few thoughts" about suicide but "nothing she thinks she would act upon" and that she stated "if she feels she may harm herself she will call [Katherine] Cote and if unable to reach her will call her grandmother." *Id.* Dr. Berrian diagnosed Ms. Herreid with "depression, somewhat situational but also may be early in a major depressive episode." (AR 382.) She prescribed Prozac as an antidepressant but noted

5

that Ms. Herreid said she wanted to think about it and consult with her father and Ms. Cote. Dr. Berrian printed out information regarding depression and antidepressants for Ms. Herreid to take with her after the appointment.

On December 5, 2011, Ms. Cote saw Ms. Herreid and noted that her "affect [was] still flat" and she was "very quiet and [her] body [was] slumped over" but her "eye contact [was] improved." (AR 407.) She opined that Ms. Herreid's "[d]epression overshadows [her] mental functioning" and that "[h]er low IQ limits her ability to use cognitive skills to improve her emotional range." (AR 407.) That same month, Ms. Cote noted Ms. Herreid reported that she was happy to have finished her childcare class and was knitting gifts, that the "medication is helping, but [she] still reports some loneliness," and that Ms. Herreid had "poor eye contact, flat affect, [however] a few more smiles on her face." *Id.* On January 5, 2012, Ms. Cote noted that Ms. Herreid presented with "little eye contact, flat affect, slumped posture" and had received "no response from child care center for jobs" and was currently volunteering at a nursing home. *Id.*

On January 6, 2012, Dr. Berrian saw Ms. Herreid for a physical evaluation. Dr. Berrian noted that Ms. Herreid reported she had been "rape[d]" and suggested some testing with regard to that event which was declined by Ms. Herreid who did not want to discuss the details of the event. (AR 380.) Dr. Berrian's notes indicate: "I think her understanding is a little limited. Will try and discuss further at the next visit. It may help for her to have a sister with her at a future visit[.]" *Id.* She further noted that Ms. Herreid reported that in the prior two weeks she had experienced several days of depression and andedonia, but denied anxiety and unusual stress. With regard to Ms. Herreid's "[s]ituational stress/depression" she noted that Ms. Herreid reported that she "feels she is doing well with [Katherine] Cote." *Id.* Dr. Berrian observed that Ms. Herreid's mental status was "intact recent and remote memory, judgment and insight[.]" *Id.* Several days later, Ms. Cote saw Ms. Herreid and recorded that her affect was still flat, her eye contact was intermittent, she exhibited slumped posture and that she "still feels hopeless about future relationships and work opportunities." (AR 408.)

6

On February 2, 2012, Ms. Cote again observed that Ms. Herreid had a flat affect, intermittent eye contact, and slumped posture and that she reported an inability to sleep. She noted that Ms. Herreid was depressed and "hopeless" and reported "suicidal ideation" including that she "thinks about taking [a] bottle of aspirin." *Id.* At the time, Ms. Herreid reported that she felt her online relationship was "hopeless" because her boyfriend was a paraplegic who lived in Wisconsin. *Id.* Ms. Cote noted that "[c]lient has contracted for safety." *Id.*

On February 16, 2012, Ms. Herreid's father was present during her treatment session with Ms. Cote. The appointment focused on Ms. Herreid's lack of job opportunities and the severity of her depression. Her father agreed to make sure that Ms. Herreid saw Dr. Berrian. Ms. Cote noted that Ms. Herreid "has even lower self-esteem around authority figures" and that her "limited mental IQ is impairing her ability to assert her power." (AR 409.) She observed that she "behaves more like an 8-10 [year] old child with father" and is "even quieter and loses eye contact" in his presence. *Id.*

On February 24, 2012, Dr. Berrian completed a one-page Mental Status Report which consisted of brief one word or partial sentence responses to thirteen criteria. She described Ms. Herreid as "quiet" and observed that her affect was "somewhat flat" but that her orientation, attention, and concentration were normal. (AR 377.) She did not record Ms. Herreid's "reported mood," but noted that her memory was intact and her energy level was normal. She recorded that although in the past Ms. Herreid had suicidal ideation, she reported none currently. She further noted that Ms. Herreid had difficulty falling asleep, but there were no reported changes in her appetite or weight. She observed that although it "sounds like [Ms. Herreid] does okay with family," her ability to relate was "difficult with strangers." *Id.* She indicated that Ms. Herreid would continue to be followed by her mental health counselor Ms. Cote.

On March 1, 2012, Ms. Cote observed that Ms. Herreid was "having difficulty with concentration. She has not been reading. Her loss of interest in all activities is a symptom of the severity of her depression. She would like to have more friends." (AR 409.) At the time, Ms. Herreid exhibited poor eye contact and a slumped posture. She

reported that she was quite isolated, had not been able to have any job interviews, and was "volunteering at nursing homes." *Id.* Later that same month, Ms. Cote noted that Ms. Herreid had "lost about 11 lbs." (AR 410.) She reported issues with sleep, depressed mood, and distractibility and "some suicidal ideation." *Id.* She exhibited "a little more eye contact, poor slumped posture, and tearfulness." *Id.* Ms. Cote again opined that Ms. Herreid's "[d]epression . . . increases her inability to use [her] mental resources." *Id.* Approximately two weeks later, Ms. Cote reported that Ms. Herreid was participating in online relationships that "are abusive for her" because she was lonely, that she presented with a depressed mood and poor eye contact and that her "[d]epression is chronic and not likely to change." *Id.*

Ms. Cote's observations of Ms. Herreid in subsequent sessions remain relatively unchanged. She noted that Ms. Herreid was quiet and exhibited poor eye contact, a depressed mood, and poor posture. During three visits in May 2012, she reported that Ms. Herreid had "some tearfulness" in addition to a flat affect; little eye contact; and poor, slumped posture. (AR 412.) On May 31, 2012, she noted that Ms. Herreid suffered from "[c]hronic depression with limited resources." *Id.*

On July 20, 2012, Dr. Berrian saw Ms. Herreid again for a follow-up "for mood" and for "depression." (AR 385.) She noted that Ms. Herreid was "[l]earning impaired[,]" was "hoping to maybe eventually get at least some part-time work" and that "[s]he does have some mental disability, and so may not be able to hold down a 40-hour a week job." (AR 386.) She observed that although Ms. Herreid "feels she is doing okay" "[i]t sounds like she does have some mood fluctuations[.]" (AR 385.) She noted that Ms. Herreid sees Ms. Cote every two weeks and feels comfortable talking with her about things and was "[o]pening up with talking with [Dr. Berrian] a little bit more." (AR 386.) She discussed Ms. Herreid's past history of rape and its impact on her current relationship and noted that she "seems happy that she does have a relationship" and concluded that Ms. Herreid was currently "doing well" and would "continue with the counseling with [Katherine] Cote." *Id.*

8

On July 12 and 26, 2012, Ms. Cote had a treatment session with Ms. Herreid who reported that she "had [a] difficult time" with a family member and "[had] isolated herself," and is "still tearful[.]" (AR 414.) Ms. Cote observed that Ms. Herreid exhibited "stooped posture," and "limited eye contact." *Id.* She opined that Ms. Herreid was experiencing "[c]hronic depression exacerbated by low IQ" and was "unable to use cognitive skills to reduce depressive affect." *Id.* In August of 2012, Ms. Cote again observed that Ms. Herreid exhibited poor eye contact, flat affect, and poor posture. She noted that she was "crying in session[.]" (AR 415.) In September and November of 2012, Ms. Cote observed that although Ms. Herreid continued to have a flat affect and poor eye contact, to have sleep and mood disturbances, and was "[s]till losing weight[,]" she was less depressed. (AR 418.) On November 19, 2012, Ms. Cote noted that Ms. Herreid was tearful with poor eye contact and her assessment was "[d]epression chronic, anhedonia, suicidal ideation continues." *Id.*

In December of 2012 until February 25, 2013, Ms. Cote recorded Ms. Herreid continued to lose weight, had a poor appetite, exhibited low self-esteem, poor posture, poor eye contact, and was tearful. She assessed Ms. Herreid with "[c]hronic depression" and "limited mental coping" and noted that she was "unable to protect herself from abusive or dominant people[.]" (AR 421.)

## C.    Ms. Herreid's Work History.

For several years, Ms. Herreid received vocational services from the Vermont Agency of Human Services, including support from Jeff Dudley, a vocational rehabilitation counselor. On October 28, 2011, Mr. Dudley noted that Ms. Herreid was "volunteering with her sister at a local Health and Rehabilitation facility roughly 10 hours a week [and he] believes that she is working at capacity volunteering with support." (AR 370.) He opined that Ms. Herreid could not "manage too much stimulation and needs to be in environments that are concrete and predictable to work independently and if she is to increase her capacity for independent employment she will need the assistance of supported employment services to secure and maintain employment." *Id.* He noted that she struggled to regulate her emotions and could be easily overwhelmed and that she also

9

"struggles with cognitive delays, and significantly delayed processing[] impact[s] her in such a way that she needs a support structure to facilitate her daily existence." *Id.*

On February 6, 2012, in a second letter, Mr. Dudley noted that Ms. Herreid was being "taken care of by her father and older brothers and sisters" and "that it is all she can do to navigate day to day needs with the support of her family." (AR 375.) He opined that Ms. Herreid "requires hand over hand, or close one on one support to learn new skills and requires an extended period of time to master them." *Id.* He concluded that "if she is to work she will need the assistance of long term supported employment services to secure and maintain employment." *Id.*

In support of his daughter's application for disability benefits, Mr. Herreid stated that his daughter had "some surprising abilities" and did not require "one on one, 24/7 supervision." (AR 339.) He noted she can "handle being on her own at home" and can make simple meals for herself, do basic household chores, and "amuse herself reading, knitting, watching movies, using Facebook and her phone, writing letters." *Id.* She makes earrings, hats, and scarfs and "is unrealistic about the worth of these things to other people." *Id.* He predicted that "[m]aybe if she was coached ruthlessly, she could get more skilled, but [she] is satisfied making the same things over and over that are obviously not skillfully made." *Id.*

Mr. Herreid further observed that his daughter "is not very good at reading people. She takes things at face value. She can be overconfident of her ability to handle new situations. . . . She doesn't understand the impression she's making. She won't know that someone is mocking her unless told or if it's blatant." *Id.* He noted that she needed help with transportation and that her "understanding of appropriate ways to dress and appropriate ways of spending money are very much dependent on who she's spending time with[,]" and that she "enjoys the company of people she met at school who have similar abilities and disabilities" and "tends to go along with their plans, for good or bad." *Id.* Although he did not believe his daughter would actively participate in "drugs, drinking, sex, stealing, vandalism, etc.," he predicted she "would not be skilled at stopping such things or getting away from them." *Id.*

10

Mr. Herreid opined that his daughter "can't compete in the job market" because "[s]he would have to be supervised and be given detailed instructions for each small task, at least until she's very familiar with it." *Id.* Vocational services was not able to place her in any employment despite her attendance at training sessions. He described her past work experiences as "internships at school: helping in the kitchen of the St. Johnsbury House, stocking shelves at Natural Provisions, helping in a mentoring program for elementary school children, volunteering at day care centers and nursing homes." *Id.* He also noted that during one summer she worked two half days per week for a friend who owns a day care business, a few half days per week for a neighbor as a companion for an elderly lady, and several days at a friend's father's butcher's shop packing meat.

### D.    Ms. Herreid's Testimony.

On March 13, 2013, at a hearing before ALJ Merrill, Ms. Herreid explained that she does not drive because her "reaction time is slow[.]" (AR 29.) She has a checking account, but she does not keep a running balance and "ask[s] at the bank what, how much [she has]." (AR 32.) She has "trouble with . . . math and stuff." (AR 28.)

Ms. Herreid testified that she spent two hours per week volunteering. She reduced her hours at the nursing home from ten hours per week to two hours per week because she "felt like [the] dates were too close together" and she would "get bored or [feel] it was like too much work for that day[.]" (AR 36.) She previously spent fifteen hours per week as a companion for an elderly woman, during which she went for walks with the woman and hung clothes to dry. She worked for eight hours per week at a daycare center, caring for children aged two to three years old, but she was told that she had trouble observing the children. She sealed and stickered meat at a butcher shop, but found it "kind of fast paced some of the time[,]" which could cause her to "get stressed out." (AR 35.) She volunteered at a library, but had to receive assistance in returning movies to the shelves. She testified that at home, she sweeps, does laundry, washes dishes, and prepares simple meals. As a source of income, Ms. Herreid's father gives her an allowance of $160 per month.

11

Ms. Herreid expressed that she felt isolated and depressed since graduating from high school. She has been "trying to apply [to] places or talk to people, think of ideas that [she] could do for work." (AR 38.) Approximately once per week, she has a bad day, which she copes with by listening to music or watching comedies. She reported that changes in plans, such as when a person breaks plans to spend time with her, bother her.

### E. Functional Assessments.

On September 15, 2011, Kathleen Filkins, M.A., a licensed school psychologist, evaluated Ms. Herreid and prepared a psychological report in anticipation of her application for disability benefits. Ms. Filkins noted that Ms. Herreid graduated from high school, "is generally healthy and does not have any medical conditions that are interfering in her [ability] to work." (AR 359.) Ms. Herreid reported "having some depression and anxiety and feelings of isolation since she left high school[,]" which Ms. Filkins attributed "to her adjusting to a new life outside of high school." *Id.*

Ms. Filkins noted that Ms. Herreid had not worked for one year. She also briefly described Ms. Herreid's work at the butcher shop, and her ability to care for pets, perform household chores, and make simple meals. Consistent with other reports, she reported that Ms. Herreid is unable to manage her finances. She noted that Ms. Herreid "was alert and responsive and cooperative throughout the evaluation." (AR 361.) She was dressed appropriately and maintained normal eye contact. She was articulate and was able to directly respond to questions. Ms. Filkins opined that Ms. Herreid had no problems with memory and her thought "processes appeared to be intact and goal directed, and she has plans for her future." *Id.*

Ms. Filkins conducted several tests to evaluate Ms. Herreid's mental functioning. Ms. Herreid scored a twenty-one out of thirty on the mini-mental status exam. According to Ms. Filkins, twenty-three is the cut off for cognitive impairment, and Ms. Herreid's score falls within the range of mild impairment.

Ms. Filkins further evaluated Ms. Herreid using the Wechsler Adult Intelligence Scale ("WAIS-IV"). Like the WIAT-II, the WAIS-IV has a mean score of 100 and a standard deviation of fifteen. Ms. Herreid received the following scores: eighty-three on

12

verbal comprehension, which places her in the thirteenth percentile; seventy-three on perceptual reasoning, which places her in the fourth percentile; seventy-one on working memory, which places her in the third percentile; and sixty-five on processing speed, which places her in the first percentile. Ms. Herreid's overall score was seventy, which places her in the second percentile and in the borderline range for intellectual functioning.

Ms. Filkins also evaluated Ms. Herreid using the Adaptive Behavior Assessment System ("ABAS-II"), which "measures skills that are important to every day life." (AR 364.) The ABAS-II has a mean score of 100 with a standard deviation of ten. Ms. Herreid's composite score on the test was eighty-four, which places her in the fourteenth percentile and in the below average range. Ms. Herreid's component scores for conceptual, social, and practical abilities fell within the average to below-average range.

Ms. Filkins noted that Ms. Herreid may "experience little or no difficulty keeping up with her peers in situations that require verbal skills." (AR 362.) However, she observed that Ms. Herried exhibited "general weakness in attention, concentration, mental control, and short-term auditory memory [that] may impede [her] performance in a variety of academic areas" and that her "ability in processing simple or routine visual material without making errors is in the extremely low range when compared to her peers." (AR 363-64.)

Ms. Filkins described Ms. Herreid as having "significant cognitive delays and learning problems" that "have been evident since birth" and noted that "she received IEP services all throughout when she was in school." (AR 366.) She observed that "Ms. Herreid is reporting some mild sadness and feelings of depression related to not having any money and not being able to find a job" and she "would like very much to be independent and to be able to have a job and her own money." *Id.*

Ms. Filkins noted that Ms. Herreid manifested concurrent deficits in at least 2 of eleven identified areas of adaptive functioning and that there were four areas of deficits consisting of "deficits in self-care, use of community [resources], health and safety, and functional academics." (AR 367.) She opined that Ms. Herreid "may have difficulty

13

living independently due to these limitations" but "would most likely be able to perform some sort of work activities where she might have contact with the public." *Id.*

Ms. Filkins's "provisional diagnosis" concluded that Ms. Herreid had an "[a]djustment disorder with mixed anxiety and depressed mood" and "[m]ild mental retardation" and "[s]ignificant occupational difficulties due to inability to find work and cognitive limitations." *Id.* She opined that Ms. Herreid was likely to be eligible for "supported employment through vocational rehabilitation and possibly she will be able to find work with the help of her case manager at Vocational Rehabilitation Services." (AR 366.)

On October 20, 2011, William Farrell, Ph.D., a non-examining state agency psychological consultant, completed a "Disability Determination Explanation." (AR 58.) He noted that Plaintiff filed for disability benefits on behalf of Ms. Herreid for "[l]earning disabilities" and "[l]earning impairments[.]" *Id.* He determined that Ms. Herreid has a "[s]evere" impairment from borderline intellectual functioning and a non-severe impairment from an affective disorder. (AR 61.) He found Ms. Herreid's condition would impose mild restrictions on daily living, mild difficulties in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace.

Dr. Farrell further found that Ms. Herreid is not significantly limited in her ability to remember locations, work procedures, and simple instructions. She is markedly limited in her ability to remember and understand detailed instructions. She is not significantly limited in her ability to follow simple instructions, but she is markedly limited in her ability to follow detailed instructions. She is not significantly limited in her ability to concentrate for extended periods of time, work with others, and make simple work-related decisions. She is moderately limited in her ability to sustain a routine without special supervision and to complete a normal workday and workweek. She requires extra supervision when starting a novel task. She is also moderately limited in her ability to respond to changes in the work setting and to set realistic goals.

14

Dr. Farrell observed that although Ms. Herreid has a learning impairment, she can "think, speak, and care for [her] own needs[,]" and "get along with others, do [her] everyday activities and follow simple instructions." (AR 66.) He also found that Ms. Herreid had mixed anxiety and depressed mood that are not severe. He concluded that, although Ms. Herreid has some limitations on her ability to perform work, her "condition is not severe enough to keep [her] from working." *Id.*

On February 22, 2012, Joseph Patalano, Ph.D., another non-examining state agency psychological consultant, conducted a second evaluation upon Ms. Herreid's request for reconsideration. Dr. Patalano's evaluation was similar to Dr. Farrell's and he concluded that Ms. Herreid's condition "results in some limitations in [her] ability to perform work related activities but does not prevent [her] from working." (AR 85.)

Ms. Cote completed several questionnaires, in which she recorded that Ms. Herreid suffers from mental retardation, severe depression, bipolar disorder, and post-traumatic stress disorder. Ms. Cote stated that Ms. Herreid manifests symptoms of these conditions including: loss of interest; weight changes; sleep disturbance; decreased energy; feelings of guilt or worthlessness; difficulty concentrating; thoughts of suicide; flight of ideas; inflated self-esteem; easy distractibility; and involvement in risky activities.

Ms. Cote opined that Ms. Herreid has marked restrictions in activities of daily living, marked difficulties in social functioning and concentration, and can expect decompensation episodes four times per year. She anticipated that Ms. Herreid would miss more than four days of work per month due to fatigue, depression, and frustration. She rated Ms. Herreid's restrictions on ability to perform daily living activities, difficulties in maintaining social functioning, and deficiencies in concentration, persistence, or pace as extreme. Similarly, she noted extreme impairment in Ms. Herreid's ability to make occupational adjustments, performance adjustments, and personal-social adjustments.

15

### F.    The ALJ's Application of the Five-Step, Sequential Evaluation Process.

In the April 23, 2013 decision, ALJ Merrill followed the five-step, sequential process[2] and determined that Ms. Herreid was not entitled to child's insurance benefits or SSI benefits because she is not disabled. At step one, he noted that Ms. Herreid had not attained the age of twenty-two years old at the time of the alleged onset of disability and had not engaged in substantial gainful activity.

At step two, the ALJ determined that Ms. Herreid had a severe impairment of borderline intellectual functioning. He noted that Ms. Filkins determined that Ms. Herreid had a full scale IQ of seventy and that she diagnosed Ms. Herreid with mild mental retardation, which is consistent with Ms. Herreid's academic record. He found that Ms. Herreid "has had some symptoms and signs of depression. However, . . . this medically determinable impairment does not have more than minimal effect on her ability to perform basic work function" and therefore is not severe. (AR 15.) He noted that Ms. Herreid was receiving counseling from Ms. Cote and that from October 2011 until March 2011, Ms. Herreid complained of being "socially isolated in the context of having completed high school without having a job." *Id.* He acknowledged that Ms. Herreid had a history of being molested and, at times, was described as having poor eye contact and a flat affect, but concluded that Ms. Cote's opinion that Ms. Herreid suffered from severe depression was contradicted by Dr. Berrian who noted Ms. Herreid was able to maintain reasonable eye contact, with a normal mood and affect, and reported being depressed only "some of the time" with mild fatigue that improved if she went for a walk.

---

[2]    The Social Security Administration regulations outline the five-step, sequential evaluation process used to determine whether a claimant is disabled: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

*Id.* The ALJ noted that Dr. Berrian attributed Ms. Herreid's symptoms to issues with friends, and that although she diagnosed Ms. Herreid with situational depression for which she recommended medication, Ms. Herreid declined treatment and, approximately six weeks later, reported only several days of depression over the prior two weeks.

Observing that "[i]t is clear that the descriptions of the claimant's symptoms and clinical signs regarding a mood disorder contrast quite significantly between Licensed Counselor Cote and Dr. Berrien[,]" the ALJ rejected Ms. Cote's opinions, noting that she was not an acceptable medical source within the meaning of the Social Security Act. (AR 16.)[3] He noted that he did not "fully reject her opinion" solely on his basis, but also because her description of the limitations on Ms. Herreid's activities differed with Ms. Herreid's self- report and with Dr. Berrian's "clinical observations[.]" He ultimately accorded Ms. Cote's opinions "little weight" and found Ms. Herreid has only mild impairments in performing daily living activities. *Id.*

The ALJ afforded "great weight" to the opinion of Dr. Farrell because it was "quite consistent" with the observations made by Dr. Berrian regarding Ms. Herreid's self-reported daily activities. *Id.* He found that Ms. Herreid has moderate impairments in her ability to maintain attention, concentration and pace with one episode of decompensation of extended duration, but only mild impairments with daily living and social functioning. The ALJ concluded the Ms. Herreid's depression was not a severe impairment.

At step three, the ALJ determined that Ms. Herreid's borderline intellectual functioning is not equivalent to a listed impairment. He found that although she has a full

---

[3] Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). "In addition to evidence from the acceptable medical sources . . . [the Social Security Administration] may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d). "While an 'other source' opinion is not entitled to any special weight, the assessment should still be given some weight, especially when there is a treatment relationship with the claimant." *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 155 (N.D.N.Y. 2012); *see also Talley v. Astrue*, 400 F. App'x 167, 169 (9th Cir. 2010) (reversing where "[t]he ALJ did not provide sufficient reasons to discredit [a therapist's] testimony").

scale IQ of seventy, "she does not have another physical or mental impairment that imposes additional and significant work-related limitations." (AR 17.) The ALJ did not specify under what subsections of Listing 12.05 he considered Ms. Herreid's impairment.

At step four, the ALJ found that Ms. Herreid

has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to 1-3-step low stress tasks. She can persist at such tasks for 2-hour blocks of time. She requires extra supervisory input with novel tasks. She can handle changes in routine, be aware of hazards and she can travel, but she may need help planning and goal setting.

*Id.* In making this determination, the ALJ considered Ms. Herreid's symptoms as well as her ability to do volunteer work, chores at home, and occasional work at a butcher's shop. He found "no medical evidence establishing that the claimant is unable to tolerate work activity that is full-time." (AR 18.) In making this decision, he accorded "great weight" to the opinions of Dr. Farrell and Dr. Patalano. *Id.*

During the March 13, 2013 hearing, the ALJ also heard testimony from a vocational expert. He asked the vocational expert a series of hypothetical questions that included limitations consistent with Ms. Herreid's education and borderline intellectual functioning. The vocational expert testified that a person with those limitations could perform several jobs, including: a cashier with 400,000 jobs nationally and 3,000 jobs regionally; a ticketer with 300,000 jobs nationally and 3,000 jobs regionally; a dishwasher with 190,000 jobs nationally and 1,500 jobs regionally; a bagger with 125,000 jobs nationally and 450 jobs regionally, and a power screwdriver operator with 57,000 jobs nationally and 260 jobs regionally. He defined the region as including Vermont and New Hampshire.

The ALJ asked the vocational expert a hypothetical question regarding whether there were significant jobs for a claimant who had extreme limitations in attention, concentration, pace, responding to work situations, relating to coworkers, responding to supervisors, responding to changes, and dealing with work stress. The vocational expert responded that a claimant with those limitations could not be competitively employed. In

18

response to a different hypothetical, the vocational expert stated that a claimant who needed a job coach might be employable, but he could not offer a reliable estimate of how many jobs would be available for such a person. The vocational expert testified that "all jobs in the unskilled job base require working at a steady pace so that alone could preclude employment in the occupations [he] cited." (AR 45.)

At step five, the ALJ determined that Ms. Herreid could work full-time as a cashier, ticketer, dishwasher, bagger, and power screwdriver operator. He found that these jobs existed in significant numbers and therefore concluded Ms. Herreid was not disabled.

## II.  Conclusions of Law and Analysis.

### A.  Standard of Review.

The court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *McIntyre*, 758 F.3d at 149 (internal quotation marks omitted). "Substantial evidence is evidence that amounts to more than a mere scintilla, and has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The court "do[es] not substitute [its] judgment for the agency's or determine *de novo* whether [the claimant] is disabled[.]" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation and internal quotation marks omitted). The court therefore "set[s] aside" an ALJ's decision "only where it is based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks omitted).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the [Social Security

19

Administration] regulations." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013). "[W]hile it is true that the Commissioner bears the burden at step five, the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005) (internal quotation marks omitted).

### B.   Whether the ALJ Erred in His Analysis of Listing 12.05C.

Plaintiff argues that the ALJ erred in his analysis of Listing 12.05C because he failed to properly consider Ms. Herreid's depression and adaptive deficits as the additional severe impairment required for that listing. In its first prong, Listing 12.05C requires a diagnosis of mild mental retardation before age twenty-two and a valid verbal full scale of 60-70. In its second prong, it requires a physical or mental impairment that imposes an additional and significant work-related limitation of function. *See Castillo v. Barnhart*, 2002 WL 31255158, at \*10 (S.D.N.Y. Oct. 8, 2002) (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C) ("Listing 12.05C requires '[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.'").

Although the ALJ acknowledged that Ms. Herreid had been diagnosed with mild mental retardation before she was twenty-two years old, he proceeded on the basis of her having borderline intellectual functioning.[4]  Generally, individuals with mild mental retardation have full scale IQ scores between sixty and seventy. *See Reed v. Colvin,* 779

---

[4]     Mild mental retardation describes an IQ of 50-55 to approximately 70.  There is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument.  Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior.  Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.  Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.

*Bouton v. Astrue*, 2008 WL 627469, at \*6 (D. Kan. Mar. 4, 2008) (citing *Diagnostic and Statistical Manual of Mental Disorders* 41-42, 48-49 (4th ed., text revision 2000)).

F.3d 725, 725 (8th Cir. 2015).  In contrast, "[b]orderline intellectual functioning is diagnosed in individuals who have an IQ score in the range of 71 to 84." *Hulsey v. Astrue*, 622 F.3d 917, 920 n.3 (8th Cir. 2010).  Using these scales, Ms. Herreid's IQ falls at the top of the range for mild mental retardation and at the bottom of the range for borderline intellectual functioning.  For purposes of the ALJ's analysis, the court agrees with the Commissioner that the difference between the two categories is not material because the ALJ's conclusion turned not on Ms. Herreid's IQ and how it should be characterized, but on her alleged lack of another severe impairment.

The ALJ found Ms. Herreid's depression was not an impairment that imposes additional and significant work-related limitations "for the reasons set forth above" which consisted of his analysis of Ms. Cote's opinions as compared to those of Dr. Berrian which he deemed to be in "quite significant[]" contrast.  (AR 16.)  He then determined that Dr. Berrian's opinions were "quite consistent" with those of non-examining State Agency psychologist Dr. Farrell and "with the claimant's daily activities." *Id.*

In evaluating Ms. Cote's opinions as a non-medical treating source, the ALJ was required to consider how long Ms. Cote knew Ms. Herreid, the frequency of their visits, the consistency of her opinions with other evidence, the degree to which she offers evidence to support her opinions, the quality of the "explanation . . . [she] provides for [her] opinion[s]," her expertise, and any other factors that tend to support or refute her opinions.  20 C.F.R. § 404.1527(c); SSR 06-03P, 2006 WL 2329939, *4-5 (Aug. 9, 2006); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("The ALJ is required to consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6)[,]" "the ALJ may discount testimony from [non-acceptable medical sources] if the ALJ gives reasons germane to each witness for doing so.") (internal quotation marks omitted).  The ALJ was required to consider these factors, even if he did not address each of them explicitly. *See LaRue v. Colvin*, 2013 WL 5637712, at *5 (D. Colo. Oct. 15, 2013) ("The ALJ explicitly addressed only one of the relevant factors under 20 C.F.R. § 404.1527(c), namely, consistency with other substantial evidence in the record.  Although the ALJ was not required to discuss each factor, she was required to consider them.") (citation omitted).

The court first addresses the alleged "significant contrast" between the opinions of Dr. Berrian and those of Ms. Cote. Dr. Berrian saw Ms. Herreid approximately three times between November 2011 until July 20, 2012 and did so, at least on one occasion, after Ms. Cote asked her to evaluate Ms. Herreid for suicidality. After speaking with Ms. Cote before the visit, Dr. Berrian diagnosed Ms. Herreid with depression and noted that it could be the onset of a major depressive disorder. She identified stressors for Ms. Herreid which included a past history of rape, an inability to find employment, difficult relations outside the family, and the loss of relationships. Dr. Berrian observed that Ms. Herreid exhibited at least some symptoms of depression and had a history of suicidal ideation. Dr. Berrian concluded Ms. Herreid's condition was sufficiently serious to warrant a prescription for an antidepressant which Ms. Herreid was reluctant to take without first discussing it with Ms. Cote and her father. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 17-18 (2d Cir. 2012) (reversing and holding that "[t]he ALJ's finding that [claimant's] depression is nonsevere is not supported by substantial evidence" where reviewing psychologist twice noted claimant was experiencing depression, where claimant's GAF[5] score reflected "moderate symptoms" including "moderate difficulty in school, work, [and] social functioning," where claimant was prescribed antidepressants, and where claimant "met with a therapist for at least some period of time"). Far from rejecting Ms. Cote's opinions as inconsistent, Dr. Berrian consistently relied on and deferred to Ms. Cote as Ms. Herreid's primary mental health treatment provider.

---

[5] The GAF measures a person's ability to function.

> The GAF is a scale ranging from zero to 100, used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health. A GAF score may help an ALJ assess mental residual functional capacity, but it is not raw medical data. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. . . . Under the GAF scale, people with GAF scores of 41 to 50 have serious symptoms . . . or any serious impairment in social, occupational or school functioning (e.g., . . . unable to keep a job). . . . By contrast, a GAF score of 51 to 60 indicates only moderate difficulty in functioning.

Carolyn A. Kubitschek & Jon C. Dubin, Soc. Sec. Disability Law & Procedure in Fed. Ct. § 5:30 (2015) (internal quotation marks and footnotes omitted).

Ms. Cote's treating relationship with Ms. Herreid was extensive and spanned over four years of twice monthly visits consisting of an hour each. Because of the nature, duration, and extent of the treatment relationship, Ms. Cote was able to note variations in Ms. Herreid's mood, affect, and coping skills. Her treatment notes, albeit only covering two years and occasionally illegible, are relatively detailed and reflect concrete, objective observations of symptoms of a depressive or mood disorder spanning well over a twelve month period. Ms. Cote repeatedly opined that Ms. Herreid suffered from "[c]hronic depression" (AR 412, 414, 419, 421) that was exacerbated by "[h]er limited IQ [which] limits her ability to use cognitive skills to improve her emotional range." (AR 407.) This opinion was not inconsistent with Dr. Berrian's conclusion that Ms. Herreid suffered from depression that required ongoing treatment. Ms. Cote's observations were also consistent with testing performed by Ms. Filkins, who is an acceptable medical source, and who provisionally diagnosed Ms. Herreid with an "[a]djustment disorder with mixed anxiety and depressed mood." (AR 367.)

The ALJ's rejection of Ms. Cote's opinions because they allegedly significantly differed from those of Dr. Berrian was thus not supported by substantial evidence in the record. The ALJ further erred in failing to adequately address the nature of Ms. Cote's treating relationship with Ms. Herreid, the quality of her explanations, and their consistency with other evidence in the record before according Ms. Cote's opinions little weight or rejecting them entirely.

Correspondingly, the ALJ failed to adequately explain why he accorded little weight to Ms. Cote's responses to questionnaires noting marked restrictions in Ms. Herreid's daily living activities and social functioning, and extreme impairment in concentration, persistence, pace and social and extreme impairment in her ability to make occupational, performance, and personal-social adjustments. Dr. Berrian rendered only cursory opinions on these topics, noting that Ms. Herreid had difficulty with strangers, struggled to find employment, had relationship issues, and was unlikely to be able to work full-time. Dr. Cote's more detailed opinions directed to specific social, daily living,

23

and work related deficits were thus not inconsistent with Dr. Berrian's more limited observations. Ms. Cote's opinions were also consistent with other evidence in the record.

According to Ms. Filkins, Ms. Herreid had a number of "deficits in self-care, use of community [resources], health and safety, and functional academics." *Id.* Ms. Filkins described Ms. Herreid as having "significant cognitive delays and learning problems" that "have been evident since birth" and noted that "she received IEP services all throughout when she was in school." (AR 366.) Ms. Filkins concluded that Ms. Herreid's challenges would likely make it difficult for her to live independently and would require "supported employment through vocational rehabilitation" and predicted that Ms. Herreid would "possibly" be able to find work with the help of her vocational case manager. *Id.*

Mr. Dudley, who had worked as Ms. Herreid's vocational case manager, was less optimistic. He opined that Ms. Herreid's "struggles with cognitive delays, and significantly delayed processing, impact her in such a way that she needs a support structure to facilitate her daily existence." (AR 370.) He noted that she is taken care of by her father and her older brothers and sisters and "that is all she can do to navigate day to day needs with the support of her family." (AR 375.) Mr. Dudley opined that Ms. Herreid's volunteer work at the time, which consisted of working with her sister ten hours a week at a nursing home, reflected her "working at capacity." (AR 370.) He observed that Ms. Herreid "requires hand over hand, or close one on one support to learn new skills and requires an extended period of time to master them." (AR 375.) He further noted that Ms. Herreid is unable to "manage stimulation and needs to be in environments that are concrete, consistent, and predictable to function independently" and that [i]f she is to work she will need the assistance of a long term supported employment services to secure and maintain employment. *Id.*

Ms. Herreid's academic records similarly reveal "[a]daptive behavior scores from 2006 testing indicat[ing] that [she] ha[s] some areas of significant need including Economic Activity and Socialization" and that her "social behaviors were largely inappropriate and her emotional/behavioral development was either delayed or impaired

24

[to] some degree." (AR 234.) Mr. Herreid described his daughter's adaptive challenges, her flawed judgment (which included an overestimation of her abilities), and her inability to conduct her own affairs, and obtain and maintain employment.[6] Ms. Cote's opinions were thus consistent with evidence provided by others who had either examined Ms. Herreid, lived with her, or worked with her closely.

In concluding that Ms. Herreid's depression and adaptive deficits were not a severe impairment, the ALJ appeared to have discounted their collective impact and imposed more than a *de minimis* standard. To qualify as a disability, a claimant must experience a severe impairment for not less than twelve months. 20 C.F.R. § 404.1505(a). In evaluating the severity of a mental impairment, the Commissioner considers the degree of limitation in: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1521(a). The purpose of this requirement is to avoid "*de minimis*" impairments, which "is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151. The Second Circuit has cited with approval Justice O'Conner's description of this standard as eliminating "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity.'" *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring)). "Basic work activities" is defined to "mean the abilities and aptitudes necessary to do most jobs[.]" 20 C.F.R. § 404.1521(b).

In evaluating whether Ms. Herreid had another impairment that "significantly limit[ed]" her ability to "engage in any basic work activity," *Dixon*, 54 F.3d at 1022, the ALJ was therefore required to impose a standard "intended to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151; *see Dixon*, 54 F.3d at 1030 (holding that the "severity

---

[6] The ALJ appeared to have relied heavily on Ms. Herreid's self-reported daily activities (without determining the reliability of her self-report) and on her father's description of her ability to perform household chores, prepare simple meals, and her limited work with family members or neighbors in supportive settings.

regulation" is "valid only if applied to screen out *de minimis* claims[.]"). His imposition of a more rigorous standard may have contributed to his conclusion that Listing 12.05C was not satisfied because Ms. Herreid did not have another severe impairment. The ALJ's decision must therefore be REVERSED and REMANDED for a redetermination of steps 2 and 3.

### C.    Whether the ALJ Erred in Failing to Consider Listing 12.05D.

Plaintiff contends that the ALJ erred in failing to consider whether Ms. Herreid's affective disorder met or equaled the criteria for a disability under Listing 12.05D. The Commissioner argues that "the ALJ did not err in not expressly discussing Listing 12.05(D), as it clearly was not met." (Doc. 5 at 23.)

Pursuant to Listing 12.05D, a person with a full scale IQ between sixty and seventy is disabled if the person has two of the following conditions: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social function; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." "The ALJ must rate the first three functional areas on a five-point scale—'[n]one, mild, moderate, marked, and extreme.'" *Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008) (quoting 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4)). The ALJ "must rate the fourth functional area on a four-point number scale—'[n]one, one or two, three, four or more.'" *Id.* (quoting 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4)).

In this case, the ALJ did not consider Listing 12.05D and thus did not explicitly address whether Ms. Herreid satisfied two or more of the conditions thereunder. He nonetheless found Ms. Herreid has "moderately impaired ability to maintain attention, concentration, and pace with 1 episode of decompensation of extended duration" and noted that "she has no more than mildly impaired ability to perform activities of daily living and to maintain social functioning." *Id.* The ALJ based these conclusions on Ms. Herreid's self-reported activities, his rejection of Ms. Cote's opinions, and the "great weight" he accorded Dr. Farrell's opinions. Although he also referred to the "clinical observations" made by Dr. Berrian, Dr. Berrian evaluated Ms. Herreid's functioning in

26

only two of the four functional areas. The ALJ did not reference evidence from Mr. Dudley, Ms. Filkins, or Ms. Herreid's academic records which specifically addressed these functional areas.

Based upon the ALJ's decision, the court cannot determine the conclusions he would have reached had he considered Listing 12.05D. Evidence in the record reflects that Ms. Herreid's ability to live independently is in question, her social functioning is clearly impaired, and her ability to maintain pace, persistence, and concentration are undisputedly impaired. A remand so that the ALJ may analyze Listing 12.05D and determine whether it applies is therefore warranted. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (reversing where "[t]he ALJ did not identify the listed impairment for which [the claimant's] symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that [the claimant's] symptoms are insufficiently severe to meet any listed impairment").

The court therefore REMANDS for a determination of whether Ms. Herreid's impairments meet or equal the criteria in Listing 12.05D in accordance with 20 C.F.R. §§ 404.1520a(c)(4); 416.920a(c)(4).

**D.    Whether the ALJ Erred in Assessing Ms. Herreid's RFC.**

Because the court has determined that a remand is necessary for other reasons, the court only briefly addresses Plaintiff's challenges to the ALJ's determination of Ms. Herreid's RFC. When assessing a claimant's mental abilities, the ALJ evaluates:

> the nature and extent of [the claimant's] mental limitations and restrictions and then determine[s] [the claimant's] residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [the claimant's] ability to do past work and other work.

20 C.F.R. § 404.1545(c). "[M]ental impairments of lesser severity" require "a detailed assessment of the individual's capacity to perform and sustain mental activities which are critical to work performance." SSR 85-16, 1985 WL 56855, *1 (Jan. 1, 1985).

27

The ALJ accorded "great weight" to the opinions of Dr. Farrell and Dr. Patalano, both non-examining reviewing state agency psychologists in determining Ms. Herreid's RFC. Generally, these sources do not constitute substantial evidence. *See Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993) ("The opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source."). The ALJ's further conclusion that Dr. Farrell's and Dr. Patalano's opinions are consistent with Dr. Berrian's opinions does not acknowledge that Dr. Berrian made only cursory observations regarding Ms. Herreid's ability to work and noted that Ms. Herreid had "some mental disability, and so may not be able to hold down a 40-hour a week job." (AR 386.) The ALJ thus erred in finding that "there is no medical evidence establishing that claimant is unable to tolerate work activity that is full-time." (AR 18.)

Mr. Dudley also opined that part-time volunteer work in a supportive setting with a family member reflected Ms. Herreid's maximum work capacity. Ms. Herreid's past work history, as documented by her father, supported this conclusion. The ALJ did not address Mr. Dudley's opinions or Ms. Herreid's observations in his RFC analysis. The court therefore cannot determine whether he rejected this evidence as unreliable or unpersuasive or both.

Two additional issues warrant further exploration on remand: full-time versus part-time work and competitive versus supportive work environment. RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8P, 1996 WL 374184, *1 (July 2, 1996). However, the Second Circuit has "decline[d] to create a *per se* rule prohibiting an ALJ from considering part-time positions." *Brault*, 683 F.3d at 450 n.6.[7] On remand, the ALJ must decide whether Ms. Herreid's RFC determination can be based solely on the ability to perform part-time work.

_____

[7] Other circuits have recognized that the ability to perform part-time work may be relevant in determining whether a claimant is disabled. *See, e.g., Liskowitz v. Astrue*, 559 F.3d 736, 745

Similarly, whether Ms. Herreid requires a special work environment presents an additional area for consideration. Dr. Farrell, Ms. Filkins, and Mr. Dudley all opined that Ms. Herreid may require a supportive work environment or a job coach. The vocational expert was unable to opine regarding whether there are jobs available that satisfy this requirement. On remand, the ALJ should consider whether Ms. Herreid will require a job coach or similar support in order to work in a competitive environment or whether she will require a special work environment in order to maintain the steady pace required for unskilled employment.

### E.   Whether Plaintiff is Entitled to a Remand only for a Calculation of Benefits.

Plaintiff seeks a reversal of the Commissioner's decision and a remand only for a calculation of benefits, arguing that no other outcome is supported by the record. *See Rosa*, 168 F.3d at 83 ("[W]here th[e] Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [it has] opted simply to remand for a calculation of benefits."). Although it is a close question in this case, were the court to remand solely for a calculation of benefits, it would be improperly supplanting its judgment for that of the Commissioner because it would need to supply explanations as well as conclusions. *See Cage*, 692 F.3d at 122 (noting the court "do[es] not substitute [its own] judgment for the agency's").

Here, adequate consideration of all of the evidence in the record, consideration of an additional listing, and the application of the proper legal standard to determine whether Ms. Herreid's additional impairments are severe may produce a different outcome. It may also impact the ALJ's determination of Ms. Herreid's RFC and a vocational expert's opinions regarding available jobs. In such circumstances, a remand is the appropriate response. *See Wells v. Colvin*, 727 F.3d 1061, 1071 (10th Cir. 2013)

---

(7th Cir. 2009) ("[T]o say that the ALJ may deny benefits only if she finds the claimant capable of some form of full-time work is quite different from saying that only full-time jobs can constitute significant work in the national economy."); *Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999) ("[I]t is not necessary for [the court] to confront the issue of whether part-time work, as opposed to full-time work, will prevent a claimant from being found disabled at Step Five of the sequential analysis.").

(remanding "for further proceedings concerning the effect of [the claimant's] medically determinable mental impairments on her RFC, and for further analysis at steps four and five, including any further hearing the ALJ deems necessary, in his discretion").

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for an order reversing the Commissioner's decision (Doc. 4), DENIES Plaintiff's request for a remand for a calculation of benefits, and DENIES the Commissioner's motion for an order affirming the Commissioner's decision (Doc. 5). Plaintiff's claim for SSI and disabled child's benefits is hereby REMANDED for a redetermination (which may include a rehearing and the development of additional evidence) of steps two through five of the five-step, sequential process.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ____ day of October, 2015.

Christina Reiss, Chief Judge
United States District Court